### In the Matter of Bradshaw SMITH, Respondent.

### No. 67116.

Supreme Court of Missouri, En Banc.

April 19, 1988.

John W. Howald, Hillsboro, for informant.

James W. Jeans, Sr., Kansas City, for respondent.

RENDLEN, Judge.

This disciplinary proceeding commenced in 1985 under Rule 5, Supreme Court Rules, by the Advisory Committee of the Missouri Bar Administration (Committee) rests on separate complaints, one of Charles and Imogene Mungle in 1981 and the other of William and Jo Ann Sanders in 1984.

The Mungle complaint arose from a real estate transaction in April 1981 involving complainants, respondent and his business

partner, Sam Gill[1]. Following an informal hearing, the Committee concluded the alleged misconduct failed to warrant further action and ended the matter with its written communication, dated *October 28, 1982,* offering respondent an admonition which he accepted in lieu of opting for a plenary hearing. The Committee advised its admonition would become a part of the record, and added, "should any of your activities *in the future* subject you to disciplinary action, this too will be given cognizance at that time...." (Emphasis added.)

The Sanders's complaint, filed August, 1984, stemmed from a *1980* real estate transaction (an activity predating the Mungle matter) involving Sanders and his wife, Jo Ann, and Home Team Realty, a real estate brokerage owned by respondent and Gill and operated by Ed Mouser. The Committee found probable cause to believe respondent's conduct required disciplinary measures and revived the Mungle complaint though, as noted above, the Sanders transaction occurred prior to the "Mungle" admonition cautioning against *future* activities.

The Committee's information filed May, 1985, charged respondent in Count I (Mungle) with conduct contrary to DR 1–102(A)(4), DR 5–101(A) and (B) and DR 7–101(A)(3) of Rule 4[2]; in Count II (Sanders) with violation of DR 1–102(A)(4) and (6) of Rule 4; and, in Count III (Sanders) with violation of DR 1–102(A)(4) and (6) and DR 9–102(A) and (B) of Rule 4 of the Supreme Court of Missouri Rules.

Much of the evidence adduced in the hearing on the information conducted by the Honorable William E. Seay, serving the Court as Special Master, appears in hopeless conflict. Witnesses testifying on behalf of respondent included Ed Mouser, John Oliver, Jr., Wanda Smith and respondent, while only the Mungles testified in

support of their complaint and William Sanders' testimony, the sole evidence supportive of his position, came in by deposition.

▇▇▇▇ In disciplinary proceedings the findings and conclusions of the Special Master are advisory and it remains the Court's duty to determine the credibility of witnesses, review the evidence and make its own determination of the facts. *In re Schiff,* 542 S.W.2d 771 (Mo. banc 1976); *In the Matter of Pine,* 576 S.W.2d 538 (Mo. banc 1979). Further, a lawyer will be disciplined only if such action is warranted by a preponderance of the evidence. *In re Conaghan,* 613 S.W.2d 626 (Mo. banc 1981).

To place the issue in context, it is well that we briefly review respondent's professional and business experience prior to the questioned transactions. Bradshaw Smith completed his work at the University of Missouri—Kansas City School of Law in 1968, was admitted to the bar and began private practice that year in Cape Girardeau. He is a second generation attorney whose father was an attorney and former judge, and his uncle was a member of the bar. During the decade that followed his admission to the bar Smith became active in community affairs, joining several civic organizations and participating in a number of public service programs.[3] He was a member of the Planning and Zoning Commission, the City Council (three terms), was appointed as Prosecuting Attorney of Cape Girardeau County and found time to work in a variety of expanding business endeavors. He was of good reputation in the community when the disputed transactions occurred.

In 1978, Smith withdrew from public office as well as the practice of law to devote full time to his business enterprises and published notice of this fact in the newspaper and other "media". By 1979, he, with

---

1. Gill is not an attorney.

2. Disciplinary Rules (DR) references are to this Court's Rule 4, Rules of Professional Conduct (repealed January 1, 1986), excise in vogue from 1971 to 1986, covering the period in which the alleged violations occurred.

3. His activities included: Deacon in First Christian Church; member of Rotary Club and Jaycees; active in United Fund and Cancer Society. Smith also received the Distinguished Service Award, the Outstanding Community Servant Award and was named in several publications as an Outstanding Young Man of America.

his business associate, Sam Gill, had become active in numerous corporate enterprises, employing approximately 100 persons, which involved mobile home parks, pharmacies, and commercial and residential real estate scattered through Oklahoma, Arkansas, Illinois and Missouri. However, due in part to the generally unfavorable business climate then prevailing, Gill and Smith's business interests foundered and in 1981 Smith declared bankruptcy and moved with his wife to Carter County. In March of the following year he resumed the practice of law, was elected Prosecuting Attorney of Carter County and serves in that office today. He is the only practicing attorney residing in the county.

## COUNT I

Count I of the information, relating to the sale of a commercial lot by Charles and Imogene Mungle to Gill and Smith in 1981, alleges that respondent *expressly directed* the preparation of the documents effecting the transaction including the note and deed of trust given to secure the purchase price from Gill and Smith; that Smith *inserted* in the deed of trust a clause subordinating the Mungles' lien to that of other future encumbrances without telling them of the clause or explaining its effect; that Gill and Smith conveyed to a subsequent buyer, who in turn pledged the property to secure payment of his note leaving the Mungles with inadequate security; and that Smith's actions violated DR 1–102(A)(4), DR 5–105(A) and (B), and DR 7–101(A)(3) of Rule 4.

The facts are these: Charles Mungle, 66, entered the embalming business in 1949 and for eleven years owned and operated a business selling funerary monuments but is now retired. While conceding involvement in a number of real estate transactions during his business career, Mungle asserted he relied on real estate agents and

lawyers to handle the details of these activities. Notwithstanding this assertion, it is apparent from his testimony that Mungle was no novice but instead had considerable experience and possessed a good working knowledge of the documents utilized in such transactions.

The April 1981 real estate sale, which forms the basis of this Count, was not the first transaction between the Mungles and the Gill–Smith partnership. Two years earlier, the Mungles had sold a house and lot in Cape Girardeau, known as lot 7, Landgraf's Subdivision to Gill and Smith [4] for the agreed price of $60,000. Of this amount Gill and respondent paid $40,000, giving their promissory note secured by a *second* deed of trust for the balance. The Mungles admitted they were aware their lien was subordinate to a prior deed of trust securing amounts due by Gill and Smith to the Colonial Federal Savings and Loan Company.

In 1981, Mungles again solicited Gill and Smith hoping to sell an office building they owned, located on Lot 6 of Landgraf's subdivision, adjoining the lot they previously sold the partners. Imogene telephoned the Home Team Realty [5] office on April 14 and spoke with the secretary, Sharon Storm. She told Ms. Storm that she and her husband wished to sell their office building and learned that Gill was in the hospital and respondent out of town. Storm advised she would convey the message and later Gill returned Imogene's call. In the negotiations that followed, Imogene and Gill agreed upon the terms of the sale and for tax purposes she agreed to take the purchase price in monthly installments with no down payment. That afternoon Sharon Storm delivered a contract for sale to the Mungles which they signed, and by its terms the Mungles agreed to carry a $45,000, 15–year note bearing interest at the rate of 10% secured by a first deed of trust

**4.** The record does not indicate whether Gill and Smith purchased lot 7 as partners or through their corporation, Cape Rock Investments, Inc. However, by 1981, lot 7 was owned by Cape Rock Investments, Inc., as evidenced by a corporate deed conveying the lot to Mid–South Tabulating Service, Inc.

**5.** Home Team Realty, Inc. was formerly known as Cape Rock Realty during the first months of its existence.

on the land conveyed. After purchasing lot 6, Gill and Smith gave a first deed of trust thereon to secure a loan of $35,000 from Colonial Federal Savings of Cape Girardeau, and then conveyed the property to their corporation, Cape Rock Limited, as they had previously done with lot 7. On July 18, 1981, Cape Rock, Ltd. conveyed both lots to Mid–South Tabulating Service, Inc., which subsequently encumbered the property for the benefit of Colonial Federal Savings and Loan to secure its note of $153,000. This security arrangement took precedence over the Gill and Smith deed of trust given the Mungles at the time of the sale.

In all this, respondent's uncontradicted testimony explained that during 1980 and thereafter he officed separately in a different building from "Home Team Realty," that he *did not* take part in any of the real estate operations on a day-by-day basis and *did not* prepare contracts or other documents in those transactions. This testimony was corroborated by Ed Mouser, the office manager of the real estate office, who testified how the daily management of the real estate office was "totally" under his direction, and it was he who managed the office, and "handle[d] the sales force" and "all the transactions." Mouser confirmed that respondent officed separately from the real estate agency and in a separate building when the agency moved from downtown to north Kingshighway in February of 1980. Because respondent was officed "downtown," he rarely came to the real estate office and never to "conduct any business." It was Gill, not respondent, who was principally involved with the hiring of Mouser, and during the years Mouser served as manager at no time did he call respondent "in on a legal matter, whether drawing contracts or whatever," and it was he who drafted all documents whether on standard forms or otherwise without discussion or consultation with Smith. This testimony remains uncontradicted and as confirmed by the Mungles, respondent had no participation in the negotiations for the purchase of lot 6, and was not in Cape Girardeau at the time.

Evidence concerning the events that followed stands in irreconcilable conflict.

The central theme of the Mungles complaint is that respondent and Gill *improperly inserted* a subordination clause in the lot 6 deed of trust without the Mungles' knowledge, after promising them a first deed of trust. The Mungles claim they did not sign the warranty deed until July 25, 1981, or see the note and deed of trust until that date, and that Smith concealed the subordination clause by stapling the pages of the deed of trust together in a way that obscured it. The documentary evidence belies their testimony. They claimed to have signed the deed July 25, but the acknowledgment bears the date April 14 and the deed was recorded, as shown by the recorder's certificate, June 24 and the deed of trust was recorded July 9. Most certainly, the Mungles' credibility suffered when they testified they signed the deed on July 25. Further, the Mungles or someone on their behalf accomplished the recording of their deed of trust on July 9th and that instrument was in their possession at least from July through September. They cannot escape being charged with knowledge of its contents though they suggest they were somehow deluded because the pages of the deed of trust were stapled near the top and they failed to read the provisions of the instrument. While even the Mungles did not testify or suggest that respondent prepared the documents in question and, as other witnesses explained, he in fact did not, the information charges that respondent "added" or caused the challenged clause to be added and the Mungles maintain he hid it from their view by the placement of the staples. Though the deed of trust was in their possession the Mungles would have us believe they did not examine it until September 14th, but these bizarre assertions fare poorly when measured against the record. In addition, Imogene's protean explanation of the warranty deed's execution bears the mark of recent fabrication. Testifying in 1987 before the Special Master, she varied her story from the two prior hearings by adding for the first time that the warranty deed which she claimed was brought by Sharon Storm on *July 25*

was a *blank* form and "she had us to (sic) sign it."

Charles Mungle testified they did not become aware of the subordination clause in the deed of trust until September 14, 1981, but both concede that when they contacted respondent he took immediate action to address their concern and told them lots 6 and 7 had been sold to Mid–South who had encumbered the lots to secure a promissory note of $153,000. A few days later he obtained for the Mungles a letter from William Schott, the President of Mid–South, agreeing that Mid–South would assume and pay the notes [6] owed by Gill and Smith to the Mungles, and promising that Mungles could maintain a deed of trust on the property second only to that of Colonial Federal. Although apparently satisfied with these terms, Mungle wanted the agreement acknowledged and with the assistance of his attorney, Mungle obtained from Schott an assumption and guaranty agreement incorporating the essential terms obtained by respondent.

The Mungles acknowledged accepting payments beginning in 1979 on lot 7 and in 1981 on lot 6 through May or June of 1986 as well as payments thereafter in the amount of $1,700.00.

■ Count I of the information charges Smith under Canon 5, DR 5–101(A) and DR 5–105(A) and (B), Canon 7, DR 7–101(A)(3), governing activities between an attorney and client. These require proof of a professional relationship but none appears demonstrating such existed. Charles and Imogene admitted Smith at no time represented them as their attorney, they had no contact with him until mid September, 1981, several months after the questioned transaction occurred, and nothing demonstrates the Mungles relied on Smith in his capacity as a lawyer. Their contacts were solely with Gill, and Imogene testified she trusted Gill "because the first time (referring to the sale of lot 7) it was all right." The Special Master, in spite of these admissions, somehow concluded an attorney-client relationship existed because the Mungles relied on Smith's general reputation in

the community as an honest lawyer. Though Smith's reputation appears to be good, this falls far short of establishing a professional relationship with a non-client. The Mungles solicited Home Team Realty encouraging them as purchaser to buy their lot and they dealt only with Gill. In the absence of proof, it cannot reasonably be inferred that in some manner they employed Smith as their attorney merely because they sought to sell land they owned to a firm in which he had an interest.

Accordingly, the charges of violations of DR 5–101(A), DR 5–105(A) and (B) and DR 7–101(A)(3) are denied.

Turning to the remaining charges of Count I, DR 1–102(A)(4) requires that "[a] lawyer shall not ... engage in conduct involving his honesty, fraud, deceit, or misrepresentation." In this connection "[I]t is not necessary to the exercise of the disciplinary powers of this Court that the fraud committed by a lawyer be committed in his capacity as a lawyer ..." *In re Kirtz,* 494 S.W.2d 324, 328 (Mo. banc 1973). *See also In re Paneck,* 585 S.W.2d 477 (Mo. banc 1979).

■ The improper acts charged here are those previously discussed, but as noted, there is no proof that Smith drafted or directed the preparation of either the contract for sale or the deed of trust. The most that can be said is that Smith signed the documents and thus had at least constructive knowledge of their contents. Such knowledge, however, does not rise to the level of affirmative deceit, fraud and dishonesty requiring the sanction of disbarment, as in *Paneck* and *Kirtz.* The most we find is a breach of contract and moreover it should be noted that Smith responded to Mungles' complaint, which bespeaks an attempt to remedy a mistake more than an intent to conceal fraud or deceit. Charles Mungle described respondent's immediate efforts taken to remedy the problem when learning of the Mungles' concerns, remedial steps which the Mungles accepted after consultation with their attorney. The Mungles settled into the new

---

6. The notes relative to the purchase of lots 6 and        7.

arrangement, receiving their payments during the five years that followed and accepting Mid–South's guarantee agreement as additional security.

This or similar evidence was submitted to the Advisory Committee in 1981, and in October, 1982, the Committee decided the evidence presented demonstrated "improper conduct" on Smith's part "in overreaching Mr. and Mrs. Mungle in drawing of (sic) a deed of trust which you should have known destroyed any security interest which they might have had," but the Committee decided the conduct warranted no more than an admonition.

The record of the Committee's informal proceeding in 1981–82 is not part of the record before us. We do not, therefore, know what conduct of Smith's the Committee thought constituted "improper conduct" or what evidence proved that *he drew* the deed of trust. Nonetheless, such evidence is absent here and because the proof before us warrants no further discipline, it would be unbecoming to invoke sanctions other than those the Committee imposed in 1982.

Finally, it might be seriously questioned whether revival of the Mungle complaint was appropriate inasmuch as the activity described in the Sanders complaint occurred before, and not *after*, that of the Mungle complaint.[7] Suffice it to say respondent has been sufficiently admonished and nothing further is required.

## COUNT II

■ This Count concerns the purchase of residential property under a contract for deed by Bill and Jo Ann Sanders from Gill and Smith, doing business as Cape Rock Investments, a partnership. The deal was brokered through Home Team Realty, Inc.[8], a corporation owned jointly by Gill and Smith, and it is charged that Gill and Smith, contrary to a provision of the contract for deed prohibiting such action, encumbered the property and in so doing Smith violated DR 1–102(A)(4) and (6). During Sanders's deposition testimony certain evidence was elicited tending to show the existence of an attorney-client relationship, a fact not alleged; however, respondent is neither required nor expected to defend against charges not contained in the information. *See In re Sizer,* 134 S.W.2d 1085 (Mo.App.1940). Moreover, to the extent Sanders attempted to describe such a relationship by claiming Smith volunteered legal advice, we find his testimony internally inconsistent[9], controverted by other evidence and inadequate for the intended task.

---

7. Smith accepted the Committee's written admonition in reliance on its statement that the matter would be put to rest unless future misconduct on his part caused revival of the charges. In so relying, he gave up the valuable opportunity to defend himself against the charges in a judicial hearing while the evidence was fresh. After the passage of five years, which produced difficulties in obtaining records and other evidence, arguably, that right cannot be fully protected. Accordingly, the virtue of the revival of the Mungle complaint is in itself clouded by a pervasive aura not unlike that of res judicata or double jeopardy.

8. Home Team Realty, Inc. was formerly known as Cape Rock Realty during the first months of its existence.

9. According to Sanders, Smith was present when he and Mouser met May 15 and completed the transaction at the Home Team Realty office; Smith reviewed the various documents with him and he relied on this conversation as legal advice. But, Sanders also testified that he took the documents to his own attorney, Jack Hoskins, for independent review. In the first informal hearing, in November of 1984, Sanders testified he did this *before* signing the contract for deed. However, in the March, 1985 hearing, he testified that he consulted Hoskins only *after* signing the document. In the deposition given January 12, 1987, he testified initially that he took the documents to Hoskins "... either right before or right after[.]" he had signed it. In response to questioning, he varied the theme, stating categorically he had signed the documents before he reviewed them with his own attorney.

Smith and Mouser offered a different account of the extent of Smith's participation in the transaction. According to them, Smith's role in the transaction was limited to that of seller. They testified that Mouser alone neogotiated the sale with Sanders and that Mouser alone drafted the documents. Mouser and Smith also testified that Smith was not present either on May 14, when Mouser and the Sanders signed the contract, or the next day, when Mouser and the Sanders executed the other documents at Sanders' home.

Bill Sanders, 30 years of age, had been actively engaged in business since graduating from high school. At the time of the questioned transaction, he operated one of the largest Standard Stations in Cape Girardeau, a 24–hour station with 10 to 12 employees and several tow trucks. The land he purchased under contract for deed consisted of a 34–acre unimproved residential plot in Cape Girardeau County.

Sanders testified he approached Ed Mouser, the manager of Home Team Realty, concerning the purchase of certain residential real estate in Cape Girardeau County in May, 1980, and Mouser showed him a 34–acre unimproved residential tract. He decided to buy the tract and on May 14, Sanders and Mouser executed a contract for sale of real estate, which Sanders knew was subject to a deed of trust securing a $22,000 note owed by Smith and Gill to Cape Mercantile Bank and Trust Company.[10] The next day, Sanders and Mouser met and completed the transaction.[11]

The contract for deed recited a sale price of $30,000.00, $4,000.00 down with the balance payable as follows:

"Balance of $26,000.00 to be carried by seller for *one year* at 11½% interest with payments of $700.00 per month due on the 15th of each month beginning June 15, 1980."

It was further provided:

"[I]f buyers shall fail to make any payment herein agreed to be made, or shall fail to do or perform any covenant or agreement on their part to be done or performed, according to the terms hereof, and such default or neglect shall continue for a period of thirty days after the time said performance is due as specified herein, then at the option of the seller the rights of buyer may be terminated and forfeited...."

Also, the contract required that buyers: "shall punctually pay all sums and payments which they have herein agreed to pay, at the time and in the manner herein provided, and shall otherwise faithfully perform and carry out all of these agreements and obligations herein contained" and that "time is of the essence of this contract as respects any other payment or act to be performed by the buyers, or of the right to declare a forfeiture of the interest of buyers by reason of any future default."

Sanders paid the original $4,000.00 and monthly installments from June through November 1980. He defaulted on the December and January payments, but Gill and Smith implicitly excused these defaults when Sanders' share of the proceeds of an easement claim settlement (see Count III) was credited to his account. Sanders resumed the monthly payments in February but failed to pay the balance in full on May 15, 1981. The contract contained a narrow and quite specific extension clause permitting the seller to extend on a month-to-month basis, but only on condition that Sanders had obtained by the end of the contract year a "loan commitment ... issued to [Sanders] by a financial institution." He failed to do so, he was in default and it was not incumbent on sellers to extend. Thus, in addition to the several tardy payments, on May 15, Sanders defaulted and nothing discloses that he cured the default by tendering payment in full or by providing a loan commitment issued by a financial institution. Gill and Smith at that time were entitled to declare the contract forfeited though nothing in the contract requires that they give formal notice to the buyer. Three months after the for-

---

**10.** At the time of the transaction between Cape Rock Investments and Sanders, the property was pledged by a deed of trust as security for a $22,000 note owed by respondent and Gill to the Cape Mercantile Bank and Trust Company. The note was a short term demand note bearing 18% interest, which contained a due on sale clause entitling Cape Mercantile to accelerate the note upon sale of the property.

**11.** Under the contract for deed the seller was to retain the legal title until purchaser had paid the full contract price. The parties' purpose in employing this technique was two-fold: Smith and Gill wished to avoid triggering the acceleration clause in their note to Cape Mercantile and the Sanders wished to lay some claim to the property without paying the then prevailing interest rate of 18%.

feiture occurred, they were pressed by the Cape Mercantile Bank to consolidate their loans and on September 16 they executed a new deed of trust on the property in question.[12] Smith notified Sanders by letter that they had pledged the property to secure the consolidated loan.

While arguably Sanders might have had some basis for a claim at law or equity to challenge the forfeiture, the right of the sellers to act on the default and treat the contract as forfeited provides no groundwork for a charge of unethical conduct and Count II of the information is denied.

### COUNT III

This Count resulted from Citizens Electric's acquisition of an easement previously mentioned across the 34–acre tract discussed in Count II. Sanders knew when he purchased the land that Citizens Electric was seeking to acquire an easement across the tract; however, he did not approach Smith concerning this matter until June, 1980, after he had executed the contract for deed. At that time, Citizens Electric had been paying neighboring landowners about $900.00 per acre for easement rights and Smith agreed with Sanders to negotiate with Citizens Electric in the hope of obtaining more than the going rate. In this he was successful and Citizens Electric ultimately paid Smith and Sanders $7,000 or about $2,400.00 per acre. By agreement, Smith retained one-third of this amount as his agreed fee and credited the remainder on Sanders's account with Gill and Smith.

The information charges that Smith applied Sanders's share of the easement proceeds to the Sanders note due Smith and Gill, after promising Sanders he would ap-ply the same to Smith and Gill's note with Cape Mercantile Bank, and that Smith deposited the check from Citizens Electric in a business account rather than a separate identifiable client account, in violation of DR 1–102(A)(4) and (6) and DR 9–102(A) and (B).

Here, as in the prior Counts, there appears an irreconcilable conflict in the testimony, and Sanders's testimony, the only evidence supporting this charge,[13] has changed from time to time as facts rebutting his story have come to light.

The easement claim settlement check from Citizens Electric, dated December 10, 1981, was credited to his account the following day, but Sanders did not complain concerning the disposition of those proceeds until April, 1984. At that time, he retained attorney Patrick O'Loughlin, who wrote to Smith on April 26 claiming his client had never received any of the funds from the easement settlement; further, that the signatures on the back of the check purporting to be the Sanders "are not theirs" and threatened legal action. Smith telephoned O'Loughlin and informed him that Sanders had in fact endorsed the check, and heard nothing further from him on the matter.

In August, 1984, Sanders pursued a different course. He complained to the Missouri Bar charging that the signatures on the easement check were forged. The Advisory Committee submitted the signatures to an expert document examiner who concluded that the signatures on the check were in truth the signatures of Jo Ann and Bill Sanders. In the face of this proof from its own witness of Sanders's misstatement of fact, the Committee nevertheless proceeded on Sanders's assertion that the

---

**12.** Within six weeks after executing the new deed of trust respondent and Mr. Gill defaulted on this loan and the bank began foreclosure proceedings. Sanders and his attorney received notice of the foreclosure proceedings from Cape Mercantile, but they did not respond. Respondent and Gill subsequently filed bankruptcy and included the Sanders among their creditors. On receipt of the notice of the bankruptcy petition Sanders consulted an attorney, Jack Hoskins. Sanders's claim was classified as an unsecured claim and witness Oliver testified Sanders's

claim was specifically listed and discharged. Thus, Sanders received notice of Smith's bankruptcy and consulted an attorney, but he neither filed a claim nor raised his present charge of fraud before the bankruptcy court. No attempt was made to void the contract on grounds of fraud.

**13.** Sanders' wife, who participated in the transaction, did not testify in the hearing before the Special Master.

signatures were forgeries and the proceeds were to have gone directly to him. However, when the hearings disclosed that Sanders' share of the proceeds in fact had been credited to his account, Sanders changed his story once again, contending that Gill and Smith had promised that his share of the easement proceeds would be applied to reduce Gill and Smith's note encumbering the property rather than to reduction of his account.

Standing against Sanders's testimony is that of Smith, his wife Wanda, and John Oliver. Smith testified he took the check to Sanders's service station, where Sanders and his wife endorsed the check and returned it to him; that it was deposited in a corporate account and the entire amount credited, less Smith's one-third contingent fee, to Sanders's account as per their agreement and denied having agreed that he would apply such amount to the Smith and Gill note. Wanda Smith corroborated her husband's account testifying that she was with Smith when he delivered the easement check and saw him hand it to Sanders. The documentary evidence shows that precisely two-thirds of the settlement proceeds were credited to Sanders's account.

■ Sanders and his attorney received separate notices of Smith's bankruptcy hearing on or about November 16, 1981, December 10, 1981, and March 10, 1982, but neither submitted a claim for the easement proceeds; instead Sanders's first complaint concerning the easement proceeds occurred five days after Cape Mercantile had foreclosed on Sanders's note. We find that the credible evidence does not support his claim that Smith promised to apply Sanders's share of the easement claim settlement to the Gill and Smith note due Cape Mercantile. The documentary evidence, and Sanders's subsequent conduct, corroborate Smith's testimony that he was to credit Sanders's share to his account with Gill and Smith. This being the case, there was no misconduct by Smith in this

respect, and accordingly the violations of DR 1–102(A)(4) and (6) are denied.

■ Finally, DR 9–102(A) and (B), governing an attorney's handling of a client's funds, require that a client's funds be deposited in an identifiable bank account, and that an attorney promptly notify the client upon receipt of such funds. By his own admission, Smith did not strictly comply with the rule requiring placement of client funds in an identifiable separate account. When he received the settlement check from Citizens Electric he delivered the check to Bill and Jo Ann Sanders for their endorsement [14], and thereafter he deposited it into the account of a business owned by him and Gill.

However, this violation of DR 9–102(A) was more formal than real. At the time Smith represented Sanders in the easement negotiations he did not maintain a client account because he was no longer generally engaged in the practice of law. To comply with the letter of the rule it would have been necessary to open a new account to deposit the single check, followed by a single check to Smith and Gill to close the account. Moreover, under the terms of their agreement, Smith was entitled to a one-third contingent fee and was to apply the balance to Sanders's note to Smith and Gill, and this was immediately done. It may fairly be said the technical violation of DR 9–102(A) did not under the facts before us offend the purpose animating the rule; however, the proper procedure in such instances is to follow the letter of the rule, and respondent is admonished for failing so to do.

BILLINGS, C.J., DONNELLY, WELLIVER, ROBERTSON and HIGGINS, JJ. and MORGAN, Senior Judge, concur.

BLACKMAR, J., not sitting.

14. This delivery of the check satisfies the "prompt notification" requirement of DR 9– 102(B) and accordingly that charge is denied.