In re Walter K. DISNEY, Respondent.

No. 77440.

Supreme Court of Missouri,
En Banc.

April 23, 1996.

Charles W. Gotschall, Kansas City, for Complainant.

Alvin C. Randall, Kansas City, for Respondent.

WHITE, Judge.

This original disciplinary proceeding considers two counts alleging professional misconduct. Respondent Walter K. Disney was charged with violation of Rules 1.3; 1.4; 1.7(a) and (b); 1.8(a); 8.4(c) and (d) of the Missouri Rules of Professional Conduct.

Complainant James A. Stauffer sought a Rule 5.10[1] review after the Chief Disciplinary Counsel found no probable cause to believe respondent Disney engaged in professional misconduct. Following review, the Supreme Court Advisory Committee appointed the Sixteenth Judicial Circuit Bar Committee to investigate Stauffer's complaint against Disney. The circuit bar committee filed a proposed information with the advisory committee. Respondent filed an answer but did not request a hearing; therefore, the matter was filed as an information in this Court. Rule 5.12.[2] The Honorable L. Glen Zahnd was appointed master. After a hearing, the master recommended a public reprimand, a brief suspension from the practice of law, and a period of probation after suspension.

■■■ The master's findings of fact, conclusions of law, and recommendations are advisory. *In re Oberhellmann,* 873 S.W.2d 851, 852–53 (Mo. banc 1994). This Court considers and weighs the evidence *de novo* and reaches its own conclusions of law. *Id.* Discipline requires a preponderance of evidence indicating professional misconduct. *In re Smith,* 749 S.W.2d 408, 410 (Mo. banc 1988).

Walter K. Disney was admitted to the Missouri bar in 1960. He and Stauffer had a business and social relationship dating from the early 1970's. Stauffer had been an investor, corporate officer, or board of directors member for several corporations with which Disney was connected, primarily as corporate attorney. Disney also served as attorney for Stauffer or members of his family on several occasions. This legal work consisted of preparing powers of attorney, preparing a warranty deed, revising wills, preparing a living trust, and giving advice about an IRS audit. Stauffer and Disney never had a written contract in connection with any of these matters, and Disney never received a retainer from Stauffer.

The complaint against Disney arises from a loan transaction between Disney and Stauffer. Disney maintained a law practice in Kansas City, Missouri, but he spent weekends in El Dorado Springs, Missouri, and rented office space there. Disney approached Stauffer in September, 1991, requesting a loan to buy the building he was renting in El Dorado Springs. He told Stauffer the building was about to be foreclosed, and he needed $35,000 to buy the building. Disney and Stauffer inspected the building on September 25, 1991, and agreed to the following loan terms: interest payments every six months, no prepayment penalty, principal payments at the discretion of the buyer, and note due in forty-two months. Disney prepared a note and a deed of trust, naming Stauffer's wife, a Kansas resident, as trustee. Stauffer delivered a cashier's check on September 27, 1991, in exchange for delivery of the note and deed of trust.

Disney had created the Matthew–Kyle Trust ("trust") on August 29, 1991, for the benefit of Disney's son, Matthew. According to complainant, when Stauffer questioned the paperwork listing the trust as borrower, Disney explained the trust was purchasing the property because his ex-wife had a judgment against him and he was shielding assets from her. Disney testified the judgments prevented him from obtaining the loan from financial institutions. Stauffer asked what would happen if the trust did not pay the note, and Disney replied, "It's a simple matter to foreclose on the building." Stauffer regarded this statement to be legal advice.

---

**1.** (1993) References to the disciplinary process rules reflect the rules in effect at the time of these proceedings.

**2.** (1994).

The cashier's check from Stauffer was made payable to Hendricks Title Company. The purchase price of the building was $24,243.41. Hendricks Title Company issued Disney a check for the $10,931.49 remaining, which he deposited in a special account in his name. Disney wrote a $10,000 check on this account to John Carter pursuant to an earlier collateral agreement buying his unrecorded interest in the property. Stauffer was not aware of these transactions.

Disney told Stauffer he would record the deed of trust, pay taxes on the building, and maintain insurance. He did not follow through. Approximately six months after Disney failed to make the first interest payment, Stauffer retained a lawyer who requested meetings with Disney to resolve the matter. Disney, Stauffer, and his attorney met in November, 1992. At that time, Disney gave Stauffer's lawyer the unrecorded deed. Stauffer's lawyer arranged to have the deed recorded November 24, 1992.

As the matter remained unresolved, Stauffer instructed his lawyer to commence foreclosure proceedings, with the sale set for August 19, 1993. The sheriff of Cedar County was named successor trustee because Mrs. Stauffer's Kansas residency rendered her unqualified to act as trustee. A day before the sale, the trust filed a petition in bankruptcy at Disney's request. The petition was dismissed a few hours before the sale. When Stauffer and his lawyer arrived at the courthouse for the sale, they were served with a summons for a lawsuit filed on behalf of the trust. Stauffer decided to cancel the sale.

The note remains unpaid. It became due March 27, 1995. As of the master's hearing in April, 1995, the balance due with accrued interest was approximately $50,000. Disney filed a motion in the above-mentioned lawsuit to pay $49,700 into court, but defendants objected. No money has been paid into court.

Informant charges Disney violated several rules of professional conduct in the course of the loan transaction. Informant argues Disney violated Rule 1.3 by failing to act with reasonable diligence in representing his client, Stauffer; Rule 1.4 by failing to keep his client reasonably informed about the sta-

tus of the real estate matter, failing to comply promptly to requests for information, and failing to explain matters to the extent necessary for the client to make informed decisions about representation; Rule 1.7(a) by representing the trust when it was directly adverse to representation of complainant without his consent; Rule 1.7(b) by representing complainant in the transaction when complainant's representation was materially limited by Disney's own interests in the matter; Rule 1.8(a) by entering a business transaction with a client and acquiring an interest adverse to the client without full disclosure, without the client's consent, and without giving the client the opportunity to seek independent advice. All of these violations are predicated on the existence of an attorney-client relationship between Stauffer and Disney during and after the loan transaction. If such a relationship did not exist, we must find for respondent on these charges. *See In re Smith,* 749 S.W.2d 408, 413 (Mo. banc 1988).

▇▇▇ The evidence establishes Disney had been Stauffer's attorney in the past, but the attorney-client relationship ended when Disney completed the last legal task, revision of a will in 1988. "[W]here the purpose of an attorney's employment has been accomplished, the relationship terminates." *Schwarze v. May Department Stores,* 360 S.W.2d 336, 338 (Mo.App.1962). Although the attorney-client relationship, " 'in a limited and dignified sense' is essentially that of principal and agent," it is limited in scope to the purpose for which the attorney is employed. *Erickson v. Civic Plaza National Bank of Kansas City,* 422 S.W.2d 373, 378 (Mo.App.1967) (quoting *Schwarze,* 360 S.W.2d at 338).

Informant argues Stauffer's reliance upon the advice he received from Disney when he asked what to do if the trust did not repay the loan, and on Disney's preparation of the paperwork for the transaction established the attorney-client relationship. However, Stauffer testified he knew a lender and a borrower were on "two different sides" and a lawyer should not represent both sides. Disney testified Stauffer described their transaction as "strictly business" and understood

they could be in conflicting positions. Stauffer's attorney accurately characterized the Disney–Stauffer relationship during the transaction when he wrote in a letter to Disney, "Mr. Stauffer advanced you said funds based on your friendship and prior attorney-client relationship." Stauffer did not seek out Disney for advice or document preparation. These were incidental to the loan Disney sought from Stauffer. The preponderance of the evidence shows no attorney-client relationship existed during the loan transaction and its aftermath. Absent the attorney-client relationship, Disney did not violate Rules 1.3, 1.4, 1.7(a) and (b), and 1.8(a).

■ Informant charges Disney engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation in violation of Rule 8.4(c). Discipline for violation of this rule does not depend on the existence of an attorney-client relationship. *See Smith,* 749 S.W.2d at 413; *In re Panek,* 585 S.W.2d 477, 479 (Mo. banc 1979); *In re Kirtz,* 494 S.W.2d 324, 328 (Mo. banc 1973). Questions of honesty go to the heart of fitness to practice law. *See Kirtz,* 494 S.W.2d at 328. Misconduct involving subterfuge, failing to keep promises, and untrustworthiness undermine public confidence in not only the individual but in the bar.

Disney engaged in subterfuge when he used the trust to shield assets from his ex-wife. His testimony about difficulty obtaining loans from financial institutions explains why he sought the loan from Stauffer, but the use of the trust to buy the building supports Stauffer's testimony about the asset-shielding purpose for the trust. Disney handled funds at the closing as an individual rather than as trustee. He received a check from the title company payable to himself rather than to the trust. He endorsed the check as an individual and deposited this check in his individual account. These actions further support the sham, asset-shielding explanation of the trust.

Disney proved untrustworthy when he failed to record the note and deed, failed to insure the building as promised, failed to pay the property taxes on time, and failed to make interest payments on the note. He was not forthcoming when he failed to disclose the collateral agreement with Carter and the actual distribution of the loan funds. His last minute revelation concerning the trust as borrower follows this pattern of less than trustworthy behavior. Count I should be sustained for violation of Rule 8.4(c), conduct involving dishonesty, fraud, deceit, and misrepresentation.

Count II charges Disney with violation of Rule 8.4(d), engaging in conduct prejudicial to the administration of justice. In his petition in the ongoing lawsuit between the parties, Disney asserts he was not in default on the loan at the time of the attempted foreclosure. The truth of this statement is at issue in the pending lawsuit. It would be premature to determine whether the lawsuit and statements in the petition are prejudicial to the administration of justice. Count II is dismissed.

■ The purpose of attorney discipline is to protect the public and maintain the integrity of the legal profession. *In re Littleton,* 719 S.W.2d 772, 777 (Mo. banc 1986). This Court has reserved disbarment for persons clearly unfit to practice law and used reprimands for isolated acts not involving dishonest, fraudulent, or deceitful conduct. *Id.* The attorney disbarred in *Kirtz* engaged in fraudulent practices as a stockholder and officer of a corporation and defrauded other corporate officers. *Kirtz,* 494 S.W.2d at 329. Disbarment was also appropriate in *Panek* where an attorney used his power of attorney for a business partner to defraud the partner. *Panek,* 585 S.W.2d at 479. Disney's actions do not rise to those levels of deceit. In *Smith,* the Court found the attorney had not acted with affirmative deceit and an admonition sufficed. *Smith,* 749 S.W.2d at 413–14.

■ The intermediate sanction of suspension is appropriate considering the circumstances of this case, where respondent violated his duty to the public to maintain personal integrity, but the conduct does not rise to a level indicating respondent is clearly unfit to practice law. *See ABA Standards for Imposing Lawyer Sanctions* Rule 5.0 (1986).

Brief suspension should be sufficient to protect the public.

Respondent is suspended with leave to reapply in six months.

All concur.