

# SUPREME COURT OF MISSOURI
## en banc

In re:  AMBRY NICHOLE SCHUESSLER,  )
                                           )      No. SC97376
             Respondent.         )

consolidated with                                 *Opinion issued August 13, 2019*

In re:  KATHERINE ANNE DIERDORF,  )
                                           )      No. SC97377
             Respondent.         )

## ORIGINAL DISCIPLINARY PROCEEDING

The Office of Chief Disciplinary Counsel (OCDC) seeks to discipline the law licenses of Ambry Nichole Schuessler and Katherine Anne Dierdorf for multiple violations of the rules of professional conduct in relation to their dishonesty about and concealment of a brutal assault of a suspect in custody by a police detective and the charges resulting therefrom filed by their friend and co-assistant circuit attorney.  At the time of the incidents, Ms. Schuessler and Ms. Dierdorf were serving as assistant circuit attorneys with the office of the circuit attorney of the city of St. Louis (OCA).

The preponderance of the evidence proves Ms. Dierdorf violated Rules 4-1.13, 4-8.4(c), and 4-8.4(d) by failing to disclose information regarding the co-assistant circuit attorney's knowledge of and conduct following the police detective's assault of the suspect in custody.  The preponderance of the evidence further establishes Ms. Schuessler violated

Rule 4-8.4(g) by making a racist and homophobic comment about the suspect's assault and Rules 4-8.4(c) and 4-8.4(d) by failing to disclose her knowledge of the assault by the police detective and her repeated dishonesty during the investigation and prosecution of the police detective.

This Court finds the severity of Ms. Dierdorf's misconduct as a result of her dishonesty and instruction of others to conceal information about the incident justifies the imposition of an indefinite suspension with no leave to apply for reinstatement for three years. Similarly, Ms. Schuessler's repeated dishonesty during and interference with the federal prosecution of the police detective justify the imposition of an indefinite suspension with no leave to apply for reinstatement for two years.

**Factual and Procedural History**

In 2011, Ms. Dierdorf became licensed to practice law in Missouri. In February 2014, Ms. Dierdorf accepted a position as an assistant circuit attorney with OCA. Ms. Dierdorf was assigned to the misdemeanor division and was supervised by Philippa Barrett.

In 2013, Ms. Schuessler became licensed to practice law in Missouri and began working as an assistant circuit attorney with OCA. She was assigned to the misdemeanor division and was supervised by Ms. Barrett.

While working at OCA, Ms. Dierdorf and Ms. Schuessler became good friends with Bliss Worrell and Lauren Collins, who were also assistant circuit attorneys in the misdemeanor division, and a summer intern, Jane Doe. The group socialized outside the

2

office and texted frequently. The following events led to the disciplinary proceedings against Ms. Dierdorf and Ms. Schuessler.

*Tuesday Night*

On Tuesday, July 22, 2014, Ms. Dierdorf, Ms. Worrell, and Ms. Doe went to a St. Louis Cardinals baseball game. While there, Ms. Worrell received a telephone call from a detective with the St. Louis police department, Thomas "Tom" Carroll. Ms. Worrell and Det. Carroll had a close, personal relationship. They talked frequently on the telephone, socialized outside of work, and were training together for a marathon. Det. Carroll called because his daughter's vehicle had been broken into and her credit card stolen. Later that night, a suspect was apprehended with the daughter's credit card.

*Wednesday*

On the morning of July 23, 2014, Ms. Dierdorf was in her office with Ms. Doe. Ms. Worrell entered the office and stated, "Tom beat up that guy" who stole his daughter's credit card. Ms. Worrell left Ms. Dierdorf's office soon thereafter, but the following group text message later occurred between the three women:

| | |
|---|---|
| Ms. Worrell: | Hah. I realized we shouldn't be talking about [T]om beating someone up in front of [another coworker.][1] That behavior is not on her "true public servant" list |
| Ms. Doe: | I think she's too dense to realize what we are talking about |
| Ms. Worrell: | That's probably true |
| Ms. Dierdorf: | Yeah she has no clue |

---

[1] This coworker had recently joined OCA and shared an office with Ms. Dierdorf. She was nearby at the time Ms. Worrell disclosed Det. Carroll beat up the suspect.

Ms. Dierdorf did not report to her supervisors Det. Carroll's assault of the suspect immediately following Ms. Worrell's disclosure of it.

Later that morning, Ms. Dierdorf was in Ms. Schuessler's office. Ms. Worrell walked into the office talking on her cell phone with Det. Carroll. She put the cell phone on Ms. Schuessler's desk and said, "Tom, tell them what you told me." Ms. Dierdorf then left the office.

On speakerphone, Det. Carroll proceeded to describe how he beat up the suspect who stole his daughter's credit card. He explained that he punched the suspect in the face and kicked the suspect while he was in a holding cell. He further stated he hit the suspect in the back with a chair and stuck a gun in the suspect's mouth. Ms. Schuessler then made the comment, "I bet that's not the first big, black thing he's had in his mouth." Det. Carroll and Ms. Worrell laughed. After the conversation ended, Ms. Schuessler did not report Det. Carroll's assault of the suspect to her supervisors.

That afternoon, Ms. Worrell went to the warrant office even though she was not assigned to the warrant office that day. She issued charges against the suspect Det. Carroll assaulted, including a felony charge for fleeing custody.

*Thursday*

On the morning of July 24, 2014, Ms. Dierdorf was, again, in her office with Ms. Doe. Ms. Worrell entered the office and told them she had issued the case against the suspect Det. Carroll beat up for stealing his daughter's credit card. The group also discussed some details of the assault before Ms. Worrell left the office.

4

Ms. Dierdorf then went to Ms. Schuessler's office. Ms. Collins was also in Ms. Schuessler's office. Ms. Dierdorf came in and said, "Bliss really messed up." She then told Ms. Schuessler and Ms. Collins that Ms. Worrell went to the warrant office to intercept the warrant application for the suspect beat up by Det. Carroll. She further stated the suspect was falsely charged with fleeing custody to explain why the suspect was injured. In response, Ms. Schuessler stated, "We could get in trouble just for knowing this." Ms. Dierdorf responded, "How would they find out. I'm not going to say anything."

After Ms. Dierdorf left the office, Ms. Collins and Ms. Schuessler checked the OCA database to see if the suspect had been charged. Their check revealed the suspect had been charged with a felony for fleeing custody. Ms. Schuessler expressed concern that an innocent man could go to jail for a crime he did not commit. Ms. Schuessler was hesitant to report Ms. Worrell's conduct because Ms. Schuessler and Ms. Dierdorf were roommates. But when Ms. Collins indicated she was going to report the incident to their supervisor, Ms. Barrett, Ms. Schuessler went with her to Ms. Barrett's office. Ms. Collins informed Ms. Barrett that she believed Ms. Worrell had filed false charges against a suspect whom Det. Carroll had assaulted while in custody.

Ms. Dierdorf was then called to discuss the matter with her supervisors – Ms. Barrett, Ed Postawko, chief warrant officer, and Beth Orwick, chief trial assistant. She disclosed that she had learned something about Det. Carroll roughing up a suspect who stole something from his daughter and that Ms. Worrell had issued charges. She was adamant she had told no one else what she knew about the assault. She did not disclose

that Ms. Worrell had told her about the assault directly or that she had learned about the assault prior to Ms. Worrell issuing charges against the suspect on Wednesday.

Ms. Dierdorf then went to a courtroom where Ms. Schuessler was also present. Ms. Dierdorf said to her, "I told them I don't know anything. You don't tell them you know anything either." Ms. Schuessler perceived Ms. Dierdorf's statement as an instruction not to tell the supervisors anything.

Ms. Schuessler was then called to interview with Mr. Postawko and Ms. Orwick. She told them she had overheard a conversation between Ms. Worrell and Det. Carroll about the assault. She also said Ms. Dierdorf told her Ms. Worrell had issued false charges against the suspect to cover up the assault. She did not disclose that she had heard Det. Carroll describe the assault on speakerphone or that Det. Carroll used a gun during the incident.

That evening, Ms. Dierdorf drove Ms. Worrell home. During the drive, Ms. Worrell spoke with Det. Carroll on a cell phone about how people found out about the assault and the charges. After Ms. Dierdorf dropped off Ms. Worrell, Ms. Dierdorf and Ms. Doe exchanged text messages. During the text conversation, Ms. Doe asked, "If they determine Bliss knew it was a false police report can any charges be brought against bliss/the cops. I hope she understands if we distance ourselves." Ms. Dierdorf responded, "Yes they can."

*Friday*

On July 25, 2014, the internal affairs division (IAD) of the St. Louis police department became involved in the matter. That morning, IAD interviewed Ms. Schuessler

6

and Ms. Dierdorf separately. Ms. Barrett, Ms. Orwick, and Mr. Postawko were also present during the IAD interviews.

Ms. Schuessler explained to IAD that she had learned a charge of resisting arrest or fleeing custody had been brought against the suspect Det. Carroll assaulted. When asked how she found out about the charge or why she believed the charge was false, she said Ms. Dierdorf had told her about it Thursday morning after learning Ms. Worrell issued the case. IAD also asked Ms. Schuessler to explain how she knew Det. Carroll "beat the crap out of" the suspect. She told IAD Ms. Worrell had been in her office talking to Det. Carroll on the telephone. She did not tell IAD the conversation was on speakerphone. Instead, she said she could hear only Ms. Worrell's portion of the conversation and gleaned information about the assault from it.

Ms. Dierdorf was also interviewed by IAD that morning. Ms. Barrett began Ms. Dierdorf's interview by asking, "Is there anything more that you want to add to [yesterday's] conversation about your knowledge of the situation we talked about?" Ms. Dierdorf stated, "Not that I can think of . . . but I [don't] know any more that I didn't say yesterday." Ms. Barrett then expressly asked Ms. Dierdorf whether she had shared information with anyone. Ms. Dierdorf stated, besides Ms. Doe being in the room when Ms. Worrell told her about issuing the case, she "hadn't spoken with anybody about it." She admitted to knowing about Det. Carroll assaulting the suspect but stated she did not learn about it until Ms. Worrell told her in her office Thursday morning. She stated she did not question Ms. Worrell further about the charges or the assault because she "had to run upstairs for a plea." She also did not tell IAD about the telephone conversation between

7

Ms. Worrell and Det. Carroll Thursday evening when she drove Ms. Worrell home. Ms. Dierdorf was subsequently sent home from work that afternoon.

Over the weekend, Ms. Dierdorf called Ms. Barrett and left a voice message. She said she wished she had been more forthcoming and wanted to talk. On the following Monday, July 28, 2014, Ms. Dierdorf was informed she could either resign or be terminated. She chose to resign from OCA. Ms. Schuessler was not terminated or asked to resign.

### The FBI Investigation

After Ms. Dierdorf resigned, the Federal Bureau of Investigation (FBI) and the United States attorney's office were brought into the investigation. On August 11, 2014, the FBI interviewed Ms. Dierdorf. Assistant United States Attorney (AUSA) Harold "Hal" Goldsmith was present for the interview.

Ms. Dierdorf told the FBI about the assault but stated she did not learn about it until Thursday morning when Ms. Worrell came into her office and told her about issuing the case. She also told the FBI about driving Ms. Worrell home and Ms. Worrell's telephone conversation on the ride home with Det. Carroll. She stated, however, that Ms. Worrell and Det. Carroll had not discussed the assault.[2]

---

[2] In her brief, Ms. Dierdorf disputes whether she lied during the FBI interviews. In doing so, she relies on testimony from her former attorney, Jeffrey Jensen, who is currently the United States attorney for the Eastern District of Missouri and was present during the FBI interviews. Mr. Jensen gave general testimony that he was unaware "of any information that Miss Dierdorf intentionally withheld from the FBI and Mr. Goldsmith during [the FBI] interview on August 11." He further stated that any "misstatement" by Ms. Dierdorf was not material. Such general testimony is inconsistent with Mr. Goldsmith's specific testimony that Ms. Dierdorf was dishonest as to when she found out about the assault and

It was not until her second interview with the FBI on September 9, 2014, that Ms. Dierdorf admitted she knew about the assault on Wednesday morning following her discussion with Ms. Worrell and Ms. Doe in her office. She also admitted to describing the assault to Ms. Schuessler and Ms. Collins on Thursday. She further admitted she had lied to her supervisors about when she learned about the assault. Finally, she told the FBI that the telephone conversation between Ms. Worrell and Det. Carroll on Thursday night was about the assault and the investigation.

On August 13, 2014, the FBI conducted its first interview with Ms. Schuessler. She told them Det. Carroll used a gun during the assault, but she attributed the racist and homophobic comment she made about the gun being in the suspect's mouth to Det. Carroll. She also did not tell the FBI the telephone was on speaker when Det. Carroll described assaulting the suspect. Following the interview, the FBI learned it was Ms. Schuessler who made the racist and homophobic comment.

On September 4, 2014, the FBI conducted its second interview with Ms. Schuessler. She admitted she heard Det. Carroll describe the assault on speakerphone. Additionally, when confronted, she admitted that she, not Det. Carroll, had made the racist and homophobic comment about the suspect having the gun in his mouth.

*Federal Prosecution of Det. Carroll and Ms. Worrell*

Det. Carroll and Ms. Worrell were subsequently indicted on federal criminal charges. Both Ms. Dierdorf and Ms. Schuessler testified during the grand jury proceedings.

---

what Ms. Worrell discussed with Det. Carroll over the telephone. Ms. Dierdorf admitted to lying about such information in her second interview with the FBI.

9

Det. Carroll pleaded guilty to deprivation of rights under color of state law, 18 U.S.C. § 242. At his sentencing hearing, Det. Carroll disputed he used a gun during the assault of the suspect. Ms. Schuessler was called to testify. During her testimony, Ms. Schuessler was impeached because of her prior inconsistent statements to her supervisors, IAD, and the FBI. The sentencing judge determined Det. Carroll used a gun during the assault and enhanced Det. Carroll's sentence to 52 months in prison.

Ms. Worrell pleaded guilty to misprision of a felony, 18 U.S.C. § 4. She was sentenced to 18 months of probation. She was later disbarred by this Court.

*Disciplinary Proceedings*

On May 30, 2017, OCDC filed an information against Ms. Dierdorf and Ms. Schuessler. The information alleged Ms. Dierdorf violated Rule 4-1.13 by failing to disclose to her supervisors the potentially illegal conduct of Det. Carroll's assault and Ms. Worrell's involvement in filing charges against the suspect. The information also charged Ms. Dierdorf with violating Rules 4-1.13 and 4-8.4(c) by lying and failing to disclose relevant and important information to her supervisors, IAD, and the FBI regarding her knowledge of Det. Carroll's assault and Ms. Worrell's involvement in issuing charges and by instructing Ms. Schuessler not to cooperate with the OCA investigation. The information further alleged Ms. Dierdorf violated Rule 4-8.4(d) by engaging in conduct prejudicial to the administration of justice.

As to Ms. Schuessler, the information charged her with violating Rule 4-8.4(c) by: (1) failing to disclose information and lying to her supervisors, IAD, and the FBI regarding her knowledge of the assault by Det. Carroll; (2) making a racist and homophobic slur in

10

response to a report of possible illegal police conduct; and (3) falsely attributing the racist and homophobic slur to Det. Carroll during her FBI interview. OCDC also alleged Ms. Schuessler violated Rule 4-8.4(d) by engaging in conduct prejudicial to the administration of justice.

Ms. Dierdorf and Ms. Schuessler denied the allegations against them. A disciplinary hearing panel (DHP) conducted a hearing on the matter. At the hearing, AUSA Goldsmith testified Ms. Dierdorf was dishonest in her first interview with the FBI about when she learned about the assault from Ms. Worrell. He further testified her dishonesty hampered the investigation because she was an essential witness due to her proximity to the situation.

AUSA Goldsmith further testified Ms. Schuessler lied during her first interview with the FBI by attributing her racist and homophobic comment about the gun to Det. Carroll. He also testified Ms. Schuessler lied during the first FBI interview by failing to disclose that she heard the details of the assault from Det. Carroll while he was on speakerphone. He further testified Ms. Schuessler's dishonesty harmed the investigation and subjected her to impeachment during Det. Carroll's sentencing hearing.

The DHP determined Ms. Dierdorf violated Rule 4-8.4(c) by failing to disclose information to the FBI. It recommended a reprimand without conditions pursuant to Rule 5.16(d)(1). In doing so, the DHP found mitigating factors, including Ms. Dierdorf's lack of disciplinary history, her remorsefulness, and her continuing to practice law appropriately.

The DHP determined Ms. Schuessler was guilty of professional misconduct for violating Rule 4-8.4(c) by failing to fully disclose information to her supervisors and the

11

FBI regarding her knowledge of Det. Carroll's involvement in the assault. The DHP found her comment regarding Det. Carroll putting his gun in the suspect's mouth to be distasteful but not, in itself, a violation of Rule 4-8.4(g). The DHP further concluded Ms. Schuessler was a whistleblower because she reported the misconduct and, therefore, was not guilty of professional misconduct under Rule 4-8.4(d). The DHP recommended Ms. Schuessler receive a public reprimand pursuant to Rule 5.16(d)(1). The DHP also found Ms. Schuessler's misstatements did not materially affect the outcome of the criminal prosecutions against Det. Carroll and Ms. Worrell. Finally, the DHP found mitigating factors, including her lack of disciplinary history and her remorsefulness.

Ms. Dierdorf and Ms. Schuessler accepted the DHP's recommendation. OCDC, however, rejected the DHP's recommendation. Accordingly, this Court must determine whether the alleged violations occurred and, if so, the appropriate discipline. Rule 5.19(d)-(e). The two cases are consolidated for purposes of this opinion.

**Standard of Review**

Before this Court can impose discipline, "[p]rofessional misconduct must be proven by a preponderance of the evidence." *In re Farris*, 472 S.W.3d 549, 557 (Mo. banc 2015). "The DHP's findings of fact and conclusions of law are advisory." *In re Krigel*, 480 S.W.3d 294, 299 (Mo. banc 2016). In disciplinary proceedings, this Court "reviews the evidence de novo, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law." *In re Snyder*, 35 S.W.3d 380, 382 (Mo. banc 2000).

12

*Rule 4-1.13*

OCDC asserts Ms. Dierdorf should be disciplined because she violated Rule 4-1.13 by failing to report Ms. Worrell's misconduct. Rule 4-1.13(b) provides in relevant part:

> If a lawyer for an organization knows that an officer, employee, or other person associated with the organization is engaged in action, intends to act, or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization.

This rule applies to government agencies. Rule 4-1.13, cmt. [6].

Here, Ms. Dierdorf – a lawyer for OCA – knew another assistant circuit attorney – Ms. Worrell – had violated the law by filing false charges against a suspect to cover up a police officer's brutal assault of the suspect. The failure to report such conduct was a violation of Ms. Dierdorf's legal obligation to the circuit attorney's organization and could have resulted in a civil rights violation or lawsuit against OCA. Accordingly, it was reasonably necessary in the best interest of OCA that Ms. Dierdorf report Ms. Worrell's conduct.[3]

Instead, Ms. Dierdorf chose to conceal her knowledge of Det. Carroll's misconduct and Ms. Worrell's filing of a false charge by lying to her supervisors, IAD, and the FBI.

---

[3] Throughout her brief, Ms. Dierdorf contends she never knew the charges were falsified at the time Ms. Worrell filed them. In support of this assertion, she relies on the fact that Ms. Worrell has always disputed whether she filed a false charge. The record shows that, at the time she spoke with Ms. Collins and Ms. Schuessler on Thursday, Ms. Dierdorf knew the charge of felony fleeing custody was false and filed to cover up Det. Carroll's assault of the suspect in custody.

Ms. Dierdorf's statements to her supervisors and IAD gave the impression that both she and Ms. Worrell did not know about the assault until after charges were filed against the suspect. She further instructed another attorney, Ms. Schuessler, not to give any information to her supervisors. Ms. Dierdorf then lied again during her first FBI interview regarding when she initially learned about the assault carried out by Det. Carroll. It was not until her second FBI interview – over a month after the incidents occurred – that Ms. Dierdorf finally admitted Ms. Worrell had told her about the assault on Wednesday prior to the filing of the charges.

As AUSA Goldsmith testified, Ms. Dierdorf "time shifted" to protect both herself and Ms. Worrell by making it appear they did not know about the assault until after Ms. Worrell filed charges. Furthermore, Ms. Dierdorf's lies and omissions interfered with and prolonged the FBI's investigation of Ms. Worrell. The record, therefore, reflects, by a preponderance of the evidence, that Ms. Dierdorf violated Rule 4-1.13 when she failed to report Ms. Worrell's misconduct.

*Rule 4-8.4(c), (d)*

OCDC further asserts Ms. Dierdorf violated Rules 4-8.4(c) and 4-8.4(d) by repeatedly lying to federal and state investigators and instructing Ms. Schuessler to lie to her supervisors about the assault and Ms. Worrell's misconduct. Rule 4-8.4(c) provides: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Rule 4-8.4(d) provides: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."

14

Ms. Dierdorf exhibited a pattern of dishonesty over the course of the criminal investigations of Det. Carroll and Ms. Worrell. She admitted during her second FBI interview that she lied to her supervisors and IAD regarding when she discovered the assault occurred. Additionally, for over a month, she concealed from her supervisors, IAD, and the FBI that Ms. Worrell knew Wednesday morning, prior to the filing of the charges, not only that Det. Carroll assaulted the suspect but also the details of the severity of the assault. She further attempted to conceal her own knowledge of the assault and Ms. Worrell's filing of a false charge by telling her supervisors she did not learn of the assault until Thursday and had not discussed the matter with anyone at the office. She also omitted facts regarding the Thursday evening telephone call between Ms. Worrell and Det. Carroll about the investigation. She even instructed Ms. Schuessler not to tell her supervisors anything and implied to both Ms. Schuessler and Ms. Collins that, by not saying anything, their knowledge of the incident prior to the charges being filed would not be discovered.

Ms. Dierdorf's dishonesty, therefore, not only interfered with criminal investigations but also concealed the professional misconduct of another attorney, Ms. Worrell. It follows that Ms. Dierdorf's dishonesty and deceitfulness were prejudicial to the administration of justice. Accordingly, the record establishes, by a preponderance of the evidence, that Ms. Dierdorf violated Rules 4-8.4(c) and 4-8.4(d).

*Appropriate Discipline*

In determining the appropriate discipline, "this Court considers the ethical duty violated, the attorney's mental state, the extent of actual or potential injury caused by the

15

attorney's misconduct, and any aggravating or mitigating factors." *In re Ehler*, 319 S.W.3d 442, 451 (Mo. banc 2010). When imposing discipline, this Court must be guided by the principle that the purpose of attorney disciplinary proceedings "is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession." *In re Gardner*, 565 S.W.3d 670, 677 (Mo. banc 2019) (quoting *In re Kazanas*, 96 S.W.3d 803, 807-08 (Mo. banc 2003)). This Court also gleans guidance from the *American Bar Association Standards for Imposing Lawyer Sanctions* (ABA Standards) and prior disciplinary precedent. *Id.*

ABA Standard 5.22 provides: "Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process." Furthermore, "[q]uestions of honesty go to the heart of fitness to practice law. Misconduct involving subterfuge, failing to keep promises, and untrustworthiness undermine public confidence in not only the individual but in the bar." *In re Disney*, 922 S.W.2d 12, 15 (Mo. banc 1996) (internal citation omitted).

Ms. Dierdorf, in her capacity as an assistant circuit attorney, knowingly failed to follow proper procedures when she discovered Det. Carroll's assault of a suspect in custody and Ms. Worrell's attempt to conceal that assault by filing false charges. When her supervisors discovered the incident, she lied to them to conceal both her and Ms. Worrell's misconduct in the matter. Such conduct undermines the public's confidence in not only OCA but also in Missouri prosecutors in general. Ms. Dierdorf's active dishonesty and

16

concealment in the matter, therefore, goes to her fitness to practice law and justifies a suspension.

Ms. Dierdorf argues a reprimand is appropriate because, while the case rests on the serious misconduct of police brutality and potentially false charges, Ms. Dierdorf was not the perpetrator of such misdeeds. She contends her misconduct is limited to two instances in which she failed to make full disclosures. But Ms. Dierdorf downplays the severity of her dishonesty over the course of the investigation into Ms. Worrell's misconduct.

A reprimand "is appropriate only where the attorney's breach of discipline is an isolated act and does not involve dishonest, fraudulent, or deceitful conduct on the part of the attorney." *In re Littleton*, 719 S.W.2d 772, 777 (Mo. banc 1986) (internal citation omitted). As previously discussed, Ms. Dierdorf engaged in a pattern of dishonest conduct by concealing when she and Ms. Worrell discovered Det. Carroll's assault of the suspect. Her dishonest behavior was not limited to a single incident but, rather, continued for weeks.

Furthermore, Ms. Dierdorf committed such acts while serving in her capacity as an assistant circuit attorney. This Court has recognized that "the responsibility of a public prosecutor differs from that of the usual advocate." *State v. Harrington*, 534 S.W.2d 44, 50 (Mo. banc 1976). A prosecutor "is not an advocate in the ordinary sense of the word, but is the people's representative, and [the prosecutor's] primary duty is not to convict but to see that justice is done." *Id.* at 49. "The prosecutor is an officer of the state who should have no private interest in the prosecution and who is charged with seeing that the criminal laws of the state are honestly and impartially administered, unprejudiced by any motives of private gain." *Id.* A "prosecutor is under a duty to consider the public interest in the

17

fair administration of criminal justice." *State ex rel. Norwood v. Drumm*, 691 S.W.2d 238, 241 (Mo. banc 1985).

These principles are reflected in the OCA personnel manual, which Ms. Dierdorf signed and acknowledged she had read and understood. In pertinent part, the manual states circuit attorneys assume "two paramount obligations: to serve the public interest; and to perform public service with high personal integrity." The manual further instructs, "Integrity requires . . . the fortitude to refuse to go along with something that you believe is ethically wrong." The manual further states that "[b]eing a good public servant means knowing how to handle the demands of your work with character and discipline" and that "[t]he true public servant . . . does not succumb to peer or other pressure" and "[r]efuses to let official actions be influenced by personal relationships."

Ms. Dierdorf's repeated dishonesty in her interviews with her supervisors and IAD shows a pattern of protecting herself and her friends over the duties she assumed when she became an assistant circuit attorney. Moreover, she encouraged other assistant circuit attorneys to keep quiet about the matter in a further attempt to conceal both her and Ms. Worrell's misconduct. At the hearing, Ms. Dierdorf admitted she had no reason to be dishonest during the interviews. She further stated she did not correct her misstatement to her supervisors because she hoped she was not going to be further involved in the matter. Her misconduct and subsequent inaction, therefore, clearly violate the standards to which Missouri prosecutors and, in particular, St. Louis circuit attorneys are held.

Ms. Dierdorf presents several mitigating factors, such as the absence of a prior disciplinary record, cooperation with the disciplinary board and proceedings, and a good

18

reputation in her current practice. But such mitigating circumstances do not outweigh the severity of her dishonesty, her selfish motive, the multiple offenses, and the vulnerability of the victim being assaulted.

This Court has previously found a suspension is the appropriate discipline when an attorney makes false and misleading statements to the FBI during a criminal investigation. *In re Zink*, 278 S.W.3d 166, 169 (Mo. banc 2009). The attorney in *Zink* was suspended indefinitely with no leave to reapply for six months. *Id.* at 170. Such discipline, however, was imposed in light of the attorney's voluntary abstention from the practice of law for one year prior to the institution of the state disciplinary proceedings. *Id.* at 169.

Ms. Dierdorf made false and misleading statements to her supervisors at OCA and to law enforcement over the course of a criminal investigation. Importantly, her repeated dishonesty occurred while she was an assistant circuit attorney. As previously discussed, such attorneys are held to a higher standard given the nature of their work to protect the public. Additionally, unlike Mr. Zink, Ms. Dierdorf has not abstained from the practice of law. Accordingly, this Court concludes that an indefinite suspension with no leave to apply for reinstatement for three years is the appropriate discipline.

## Ms. Schuessler's Conduct

### *Rule 4-8.4(c)*

OCDC asserts Ms. Schuessler violated Rule 4-8.4(c) by repeatedly lying to and withholding information from criminal investigators about Det. Carroll's assault of a detained suspect, thereby prejudicing the prosecution of Det. Carroll. Ms. Schuessler's conduct following her discovery of the assault establishes a pattern of dishonest behavior.

19

Ms. Schuessler heard Det. Carroll describe, in detail, his assault of the suspect. Yet, in her interview with her supervisors and IAD, she did not reveal the speakerphone conversation. Instead, she told IAD she could hear only Ms. Worrell's side of the conversation. It was not until over a month later, in her first FBI interview, that she admitted Det. Carroll was on speakerphone and she heard the details of the assault directly from him, including that he put a gun in the suspect's mouth. But even then, she chose to lie by attributing her racist and homophobic comment to Det. Carroll. Again, such lies went uncorrected for nearly a month until her second FBI interview. Ms. Schuessler, therefore, engaged in dishonest and deceitful conduct in violation of Rule 4-8.4(c) during the criminal investigation of Det. Carroll.

### Rule 4-8.4(g)

OCDC further asserts Ms. Schuessler's comment about the gun in the suspect's mouth was racist and homophobic, thereby violating Rule 4-8.4(g). Rule 4-8.4(g) provides a lawyer engages in professional misconduct by "manifest[ing] by words or conduct, in representing a client, bias or prejudice based upon race, sex, religion, national origin, disability, age, or sexual orientation." "Whether a lawyer's conduct constitutes professional misconduct in violation of Rule 4-8.4(g) can be determined only by a review of all of the circumstances." Rule 4-8.4(g), cmt. [4].

Ms. Schuessler contends the comment cannot constitute a Rule 4-8.4(g) violation because it was not made in the context of "representing a client." OCDC responds that, as a prosecuting attorney, Ms. Schuessler is always representing the people of Missouri.

20

Ms. Schuessler was in her office at OCA, during working hours, when she made the racist and homophobic comment. She was required, as an assistant circuit attorney, to act in the best interest of OCA and the citizens of the city of St. Louis. A prosecutor is not representing a client only when performing a specific act in a case. Ms. Schuessler's conduct, therefore, violated Rule 4-8.4(g). The violation was particularly egregious given the circumstances in which the racist and homophobic comment was made.

### Rule 4-8.4(d)

Finally, OCDC asserts Ms. Schuessler's dishonesty during Det. Carroll's criminal investigation violates Rule 4-8.4(d). Again, Rule 4-8.4(d) provides: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."

As previously noted, Ms. Schuessler made repeated lies and omissions over the course of the investigation into Det. Carroll's assault on the suspect in custody. Her repeated lies and omissions prolonged the criminal investigation of Det. Carroll. Her dishonesty further posed a potential risk to the prosecution of Det. Carroll by opening herself up to impeachment at the sentencing hearing. As a result, Ms. Schuessler engaged in conduct prejudicial to the administration of justice in violation of Rule 4-8.4(d).

### Appropriate Discipline

Again, "this Court considers the ethical duty violated, the attorney's mental state, the extent of actual or potential injury caused by the attorney's misconduct, and any aggravating or mitigating factors" when determining the appropriate attorney discipline. *Ehler*, 319 S.W.3d at 451. This Court also looks to discipline it has imposed in similar

21

cases and gleans guidance from the ABA Standards. *Gardner*, 565 S.W.3d at 677. ABA Standard 5.22 provides: "Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process."

Ms. Schuessler, in her role as assistant circuit attorney, violated the public trust when she learned, firsthand, about the assault of a suspect in custody by a police officer and failed to report the incident. She made light of the assault and joined in demeaning the victim by making a racist and homophobic slur about him. She then repeatedly lied about her knowledge of the assault to her supervisors, IAD, and the FBI for more than a month following the incident. Her dishonesty and failure to act interfered with and prolonged the criminal investigation of Det. Carroll. When asked why she did not initially report the assault after hearing Det. Carroll describe it, she stated she did not "want to be a part of it" so she "sat on it." She later indicated she was scared to report it because she was currently living with Ms. Dierdorf and did not want to expose her friends.

Ms. Schuessler contends that, at most, a reprimand is the appropriate discipline because she has already endured four and a half years of chaos, despair, and fear resulting from these incidents. But again, a reprimand is not appropriate given Ms. Schuessler's repeated dishonesty during the course of the Det. Carroll investigation. *See Littleton*, 719 S.W.2d at 777. Additionally, like Ms. Dierdorf, Ms. Schuessler was dishonest while serving in the role of prosecutor. Her dishonesty and failure to uphold the duties outlined for her as an assistant circuit attorney indicate a suspension is the appropriate discipline.

Ms. Schuessler's misconduct exhibits some of the same aggravating factors as Ms. Dierdorf's, namely the pattern of dishonesty and multiple offenses. A mitigating factor is that Ms. Schuessler accompanied Ms. Collins when Ms. Collins went to Ms. Barrett's office to report Ms. Worrell and Det. Carroll's conduct. Additionally, Ms. Schuessler has sought counseling of her own accord. These factors, in addition to her lack of prior disciplinary history, cooperation throughout the course of the disciplinary proceedings, and good reputation in her current practice lead this Court to find the appropriate discipline is an indefinite suspension with no leave to apply for reinstatement for two years.

## Conclusion

This Court orders that Ms. Dierdorf be suspended indefinitely from the practice of law with no leave to apply for reinstatement for a period of three years from the date the mandate issues in this cause. This Court further orders that Ms. Schuessler be suspended indefinitely from the practice of law with no leave to apply for reinstatement for a period of two years from the date the mandate issues.

_____
PATRICIA BRECKENRIDGE, JUDGE


All concur.